## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARLES WILHITE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 14-30023 |
| | ) |
| ANTHONY PIOGGIA and STEVEN TATRO, | ) |
| in their individual capacities, and | ) |
| THE CITY OF SPRINGFIELD, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

### INTRODUCTION

1.     Plaintiff Charles Wilhite spent more than three years in prison for a crime he did not commit. In December 2010, Mr. Wilhite was convicted of first-degree murder based solely on false eyewitness testimony. There was no physical evidence linking him to the crime. Two witnesses eventually recanted, revealing that Defendants Anthony Pioggia and Steven Tatro of the Springfield Police Department had pressured, threatened, and coerced them to implicate Mr. Wilhite in the crime. On January 17, 2013, after he had spent 40 months in prison, a second jury acquitted Mr. Wilhite and he was released from custody.

2.     Mr. Wilhite's wrongful conviction resulted from unconstitutional and tortious conduct by Defendants Pioggia and Tatro and from the policies, customs, and practices of the City of Springfield that caused Springfield police officers to believe they could violate the Constitution to obtain a conviction. Despite Mr. Wilhite's innocence and the utter lack of evidence against him,

Defendants Pioggia and Tatro fabricated evidence and used grossly improper identification procedures to cause Mr. Wilhite's arrest, trial, conviction, and lengthy imprisonment.

## JURISDICTION

3.      This action is brought pursuant to 42 U.S.C. §1983 and §1988 and the Fourth and Fourteenth Amendments to the U.S. Constitution. Title 28 U.S.C. §1331 and §1343 provide federal question jurisdiction over all federal claims, and 28 U.S.C. §1367 provides supplemental jurisdiction over state law claims.

## PARTIES

4.      Plaintiff Charles Wilhite was at all times relevant to this complaint a resident of Hampden County, Massachusetts. He is African-American.

5.      Defendant Anthony Pioggia was at all times relevant to this complaint a duly appointed police officer of the Springfield Police Department. His actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Springfield. He is sued in his individual capacity.

6.      Defendant Steven Tatro was at all times relevant to this complaint a duly appointed police officer of the Springfield Police Department. His actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Springfield. He is sued in his individual capacity.

7.      Defendant City of Springfield is a duly organized municipal corporation under the laws of the Commonwealth of Massachusetts.

## FACTS

### *The Crime*

8.      On October 14, 2008, Alberto Rodriguez was shot and killed in Springfield,

Massachusetts.

9.      Mr. Rodriguez was shot outside the Pine Street Market, a small convenience store

located at 194 Pine Street in Springfield. He was shot once in the back while driving his car.

10.      Physical evidence established that the shooter fired multiple shots into the car from

outside the rear driver-side area. The bullet that struck Mr. Rodriguez travelled into the car through

the rear driver-side window, through the back of the driver's seat, and into Mr. Rodriguez's back.

Other shots hit the car but did not hit Mr. Rodriguez.

11.      Mr. Rodriguez sped away from the scene as the shots were fired. He crashed into a

parked car about a block away, in front of 21 Ashley Street. He was taken from there to a local

hospital and pronounced dead.

12.      Springfield police officers responded to the Pine Street Market within minutes of the

shooting. They secured the crime scene and began interviewing witnesses.

13.      Three witnesses told police that a Hispanic male in a gray hooded sweatshirt had run

down Central Street away from Pine Street just after the shooting. One of these witnesses, Maria

Torres, told officers that the Hispanic male had been carrying a silver handgun as he ran from the

scene.

14.      In addition to the three witnesses mentioned above, two confidential informants

later told Defendant Pioggia that the shooter was a Hispanic male.

15.      Numerous other witnesses told police that Mr. Rodriguez had had a longstanding

feud with Angel Hernandez, the Pine Street Market's owner. Police learned that Mr. Rodriguez and

Mr. Hernandez had fought in the past and had threatened each other just one day before the shooting. At least one witness reported that a young Hispanic male had threatened Mr. Rodriguez with a gun in front of the Pine Street Market the day before the shooting.

### The Initial False Identification of Charles Wilhite

16.     Defendants Anthony Pioggia and Steven Tatro were assigned to investigate the murder of Alberto Rodriguez. Both Defendants are detectives in the Springfield Police Department's homicide division.

17.     After investigating the case for more than two weeks, Defendants Pioggia and Tatro were unable to identify a suspected shooter.

18.     On November 5, 2008, approximately three weeks after the murder, Defendants Pioggia and Tatro went to the home of Giselle Albelo on Pine Street near the scene of the shooting.

19.     Ms. Albelo was not a witness to the murder. She was home at the time of the shooting and had not heard any shots fired. She had not previously contacted police about the shooting or given police any information to suggest that she was a witness to the crime.

20.     Nevertheless, Defendants Pioggia and Tatro brought Ms. Albelo to the Springfield police station for questioning. As Defendants drove Ms. Albelo to the station, they talked to her about the night of the shooting. Ms. Albelo told Defendants Pioggia and Tatro that she had not been at the Pine Street Market at all that night and did not witness the crime.

21.     While being questioned at the police station, Ms. Albelo told Defendants Pioggia and Tatro basic information about the shooting that she had learned from talking with people in the neighborhood. Defendants Pioggia and Tatro supplied Ms. Albelo with other information about the crime during the questioning.

4

22.     The detectives did not audio or video record their interview with Ms. Albelo, although they had the equipment to do so at the police station.

23.     Defendants Pioggia and Tatro threatened and intimidated Ms. Albelo in order to get her to say that she had witnessed the shooting. They pressured Ms. Albelo to say that she had been inside the Pine Street Market at the time of the shooting and had seen a black male shoot Mr. Rodriguez.

24.     Ms. Albelo eventually acquiesced to the pressure and signed a witness statement written by Defendants Pioggia and Tatro. In the statement, Ms. Albelo claimed to have seen Alberto Rodriguez and a black male standing outside the Pine Street Market. She claimed that the black male pointed a gun at Rodriguez and fired one shot into his back; Rodriguez then ran to his car and drove away while the black male fired four more shots.

25.     Ms. Albelo's witness statement did not fit the physical evidence. It was wrong about basic and crucial details, including where the victim was when he was shot and where the shooter was standing.  Any reasonable police officer would have known that Ms. Albelo was not a reliable or credible witness.

26.     Despite this, Defendants Pioggia and Tatro showed Ms. Albelo photographs of eight black males. The last photo in the array was a picture of Plaintiff Charles Wilhite. Mr. Wilhite was the target of the array.

27.     After Ms. Albelo selected Mr. Wilhite's picture, Defendants Pioggia and Tatro told her that the person she identified was Charles Wilhite.

28.     Ms. Albelo's identification of Charles Wilhite was the result of police pressure and intimidation. Any reasonable police officer would have known that her identification was unreliable.

29.     On information and belief, Defendants Pioggia and Tatro were improperly suggestive in showing Ms. Albelo the photo array so that she would select Mr. Wilhite's picture.

30.     Defendants Pioggia and Tatro knew Mr. Wilhite. In 2007, they tried to pressure Mr. Wilhite to become a witness in a murder case even though Mr. Wilhite had not been a witness to that crime. The detectives threatened and intimidated Mr. Wilhite in an attempt to have him sign false witness statements containing information that he had not provided to the detectives. Defendants Pioggia and Tatro sought to have Mr. Wilhite give false testimony in court in order to help the detectives obtain a conviction. Mr. Wilhite refused to be a part of Defendants' unlawful methods.

### Suggestive Photo Identifications

31.     Although multiple witnesses had told police that the shooter was a Hispanic male, Defendants Pioggia and Tatro failed to investigate these leads. They focused on Mr. Wilhite. They directed their investigative efforts into building a case against Mr. Wilhite for the murder of Alberto Rodriguez.

32.     On November 6, 2008, the day after Defendants Pioggia and Tatro interviewed Ms. Albelo, they brought Patryce Archie to the police station for questioning.

33.     Ms. Archie had initially provided a statement to Springfield police detective James Goldrick on October 16, 2008, two days after the shooting. In that statement, Ms. Archie explained that she had been inside the Pine Street Market at the time of the shooting but did not see what happened.

34.     During her interview on November 6, Ms. Archie told Defendants Pioggia and Tatro that she had seen a black male standing near the Pine Street Market just before the shooting, but that she could not identify the man because she had only seen his nose and lips.

35.     Defendants Pioggia and Tatro had Ms. Archie view a photo array containing Charles Wilhite's picture. Mr. Wilhite was the target of the array.

36.     Defendants Pioggia and Tatro did not audio or video record Ms. Archie's interview or identification process, despite having the equipment to do so at the police station.

37.     Defendants Pioggia and Tatro used unduly suggestive procedures to get Ms. Archie to select Charles Wilhite's picture. This included having Ms. Archie repeatedly view the array until she selected a photograph, even after she told the detectives she was not able to identify anyone.

38.     After Ms. Archie selected Mr. Wilhite's picture, Defendants Pioggia and Tatro drafted a new witness statement for Ms. Archie to sign. The new statement contained a different account of the shooting from the one Ms. Archie had initially provided to police.

39.     In drafting Ms. Archie's new witness statement, Defendants Pioggia and Tatro materially misrepresented the identification procedure that resulted in Ms. Archie selecting Charles Wilhite's picture. Defendants made it appear that she had identified Mr. Wilhite when she had not made a positive identification.

40.     The new statement claimed that Ms. Archie had selected Mr. Wilhite's photograph from the array and had told Defendants Pioggia and Tatro that "this guy may have been the guy that was out in front of the store when I went in with the gray hoodie on."

41.     Defendants Pioggia and Tatro omitted from the statement that Ms. Archie had told them she had not seen the man's face but only his nose and lips. The statement failed to mention that Defendants Pioggia and Tatro had covered each picture in the array to show only the nose and mouth. The statement omitted that, when Ms. Archie selected Mr. Wilhite's picture, she told Defendants Pioggia and Tatro "I don't know if that's him or not" and that she was only selecting the photograph because "the lips looked familiar" to her. The statement omitted that Defendants

7

Pioggia and Tatro had Ms. Archie look through the array repeatedly until she selected a picture. The statement omitted that Ms. Archie was with her one-year-old child and that she had wanted to leave the police station because her child was restless.

42.     After Ms. Archie selected Mr. Wilhite's picture, Defendants Pioggia and Tatro told her that the person she identified was Charles Wilhite.

43.     Ms. Archie's statement about Charles Wilhite contradicted the statement Ms. Albelo had given the day before. While Ms. Albelo claimed that Mr. Wilhite had been inside the store just before the shooting, Ms. Archie claimed that he had been standing outside, away from the store, near a house next to the store.

44.     In or about January 2009, Defendant Pioggia and another Springfield detective interviewed Maria Torres, the witness who told police on the night of the shooting that she had seen a Hispanic male in a gray hooded sweatshirt running from the scene with a gun in his hand just after the shots were fired.

45.     During the interview, Defendant Pioggia showed Ms. Torres a photo array of black males. Charles Wilhite was the target of the array. Ms. Torres did not identify anyone from the array and repeated to Defendant Pioggia that the person she had seen with the gun was a "light-skinned" Hispanic male.

46.     Springfield Police Department records describe Mr. Wilhite as a "dark brown," "non-Hispanic" male.

47.     Defendant Pioggia did not audio or video record his interview with Ms. Torres, despite having the equipment to do so.

48.     On March 11, 2009, Defendant Pioggia and Detective Timothy O'Shea interviewed Maria Torres for a second time. During this interview, Defendant Pioggia showed Ms. Torres at

least two photo arrays, one of Hispanic males and another of black males. Charles Wilhite was the target of the array of black males. Ms. Torres did not identify anyone from either array as the person she had seen running down Central Street with a gun.

49.     After Ms. Torres said she was unable to identify anyone, Defendant Pioggia asked her to select a picture based on the skin tone of the person she had seen running down Central Street with a gun. Ms. Torres selected a picture of a light-skinned Hispanic male from the array of Hispanic males. She selected the picture only for the skin tone, not to identify the person pictured.

50.     Despite this selection, Defendant Pioggia then asked Ms. Torres to again review the array of black males and consider whether it was possible the person she saw running down Central Street had been black. Ms. Torres said it was possible and selected a photograph from the array of black males based on skin tone. The second photograph she selected was a light-skinned black male. It was not Charles Wilhite.

51.     After Ms. Torres had picked two photographs, Defendant Pioggia asked her to continue reviewing the array of black males and consider whether anyone else's skin tone was "close." Ms. Torres continued reviewing the array and eventually selected Mr. Wilhite's picture. According to Defendant Pioggia's "Investigative Report" of this interview, Ms. Torres selected Mr. Wilhite's picture and stated his "skin tone was also close." Ms. Torres later saw Mr. Wilhite at the criminal trial. She testified at trial that Mr. Wilhite's skin tone was not close to the person she saw running down Central Street on the night of the shooting.

52.     Defendant Pioggia's Investigative Report of his interview with Ms. Torres materially misrepresented the identification procedure Defendant Pioggia had conducted. Defendant Pioggia omitted from his report that he had asked Ms. Torres to select a picture based on skin tone. He omitted from his report that Ms. Torres had first selected a picture based on skin tone from the

array of Hispanic males. The report omitted that Ms. Torres had signed the picture of the Hispanic

male she selected based on skin tone. The report omitted that Defendant Pioggia had asked Ms.

Torres to keep looking through the array after selecting pictures and falsely implied that Ms. Torres

had done this on her own.

53.     Defendant Pioggia pressured and coerced Ms. Torres to select Mr. Wilhite's picture.

54.     Any reasonable police officer would have known that it is improperly suggestive to

ask a witness to continue selecting photos from an array until she selects the target. Doing so

violates basic principles of eyewitness identification that are designed to prevent false and unreliable

witness identifications.

### *Manufactured Jailhouse Witness*

55.     On September 17, 2009, Defendants Pioggia and Tatro went to the Hampshire

County Jail to question Anthony Martinez. At the time of the shooting, Mr. Martinez had been

living on Pine Street in Springfield near the Pine Street Market. He was arrested in July 2009 for

armed robbery.

56.     On information and belief, Defendants Pioggia and Tatro offered Mr. Martinez

favorable treatment on his pending criminal charges if he supplied information implicating Charles

Wilhite in the murder of Alberto Rodriguez.

57.     After being questioned, Mr. Martinez signed a witness statement drafted by

Defendants Pioggia and Tatro. In the statement, Mr. Martinez claimed that he had been at the Pine

Street Market minutes before the shooting and had seen Charles Wilhite there. Mr. Martinez claimed

that he had seen Angel Hernandez hand Mr. Wilhite a gun and say, "I'll pay you to go kill him." Mr.

Martinez claimed, "I know it looks funny because I am in jail and all of a sudden have this

information, but it is the truth."

58.     Many details of Mr. Martinez's statement were inconsistent with the accounts of all other witnesses in the case. For example, Mr. Martinez's statement described more people being inside the Pine Street Market than any other witness. He also stated that a female had been working at the counter inside the Pine Street Market, though every other witness told police it had been Angel Hernandez, the store's owner. Mr. Martinez's statement was obviously false.

59.     Additionally, Mr. Martinez stated that he had been inside the Pine Street Market just before the shooting while wearing his Burger King uniform. Mr. Martinez is a huge man, both in height and weight. The interior of the Pine Street Market is small with narrow aisles. None of the witnesses who were in the market saw a person of Mr. Martinez's size nor did anyone see a person wearing a Burger King uniform in or near the Pine Street Market on the night of the shooting.

60.     Any reasonable police officer would have known that Mr. Martinez was not a reliable or credible witness. Any reasonable police officer would have known that Mr. Martinez's statement was false.

61.     Defendants Pioggia and Tatro showed Mr. Martinez a photo array of black males. Charles Wilhite was the target of the array. Mr. Martinez selected Mr. Wilhite's picture and identified him as the person who took the gun from Angel Hernandez. On information and belief, Defendants Pioggia and Tatro were improperly suggestive in showing the array to Mr. Martinez.

62.     Defendants Pioggia and Tatro did not audio or video record their interview with Mr. Martinez, despite having the ability to do so.

63.     In an interview with Springfield police lieutenant Trent Duda and detective Edward Sierra on December 13, 2012, Mr. Martinez's girlfriend, Chelsea Ortiz, explained that Mr. Martinez was not at the Pine Street Market at the time of the shooting. He had been home with her in their

apartment on Pine Street for several hours before the shooting occurred. Ms. Ortiz explained that Mr. Martinez only went outside after the shooting to see what had happened.

64.     Unlike any of the witnesses interviewed by Defendants Pioggia and Tatro, Lieutenant Duda and Detective Sierra's interview with Ms. Ortiz was recorded on video.

### The Arrest and Indictment of Charles Wilhite

65.     On September 17, 2009, the same day that Defendants Pioggia and Tatro obtained a statement from Mr. Martinez, Defendant Pioggia applied for a warrant to arrest Charles Wilhite. Defendants Pioggia and Tatro executed the warrant that evening and arrested Mr. Wilhite at his home.

66.     Defendants Pioggia and Tatro also obtained a warrant to arrest Angel Hernandez for the murder.

67.     Defendants Pioggia and Tatro brought Mr. Wilhite to the Springfield police station to interrogate him. Mr. Wilhite waived his right to remain silent and agreed to speak with the detectives. Defendants Pioggia and Tatro recorded their interrogation of Mr. Wilhite on video.

68.     Mr. Wilhite repeatedly told Defendants Pioggia and Tatro that he had not been near the Pine Street Market on the night of the murder. He explained that he had not been involved in the shooting in any way.

69.     Defendants Pioggia and Tatro caused Mr. Wilhite to be charged with murder in the first degree, a crime that carries a mandatory sentence of life in prison without the possibility of parole.

70.     There was no physical evidence linking Mr. Wilhite to the crime or the crime scene.

71.     The only witnesses to implicate Mr. Wilhite in the murder were the witnesses described above who were interviewed by Defendants Pioggia and Tatro.

72.     None of the identifications or witness interviews that led to evidence against Mr. Wilhite were audio or video recorded.

73.     On October 22, 2009, the Hamden County District Attorney's office presented the case against Mr. Wilhite to a grand jury for indictment.  Mr. Wilhite's case was presented together with the case against Angel Hernandez. The prosecutor presented the evidence by calling the witnesses who had provided statements to the police. The prosecutor read the witness statements to the grand jury and then asked each witness if any information in the statements needed to be corrected. There was no other evidence presented implicating Charles Wilhite.

74.     That same day, the grand jury returned an indictment against Mr. Wilhite for first degree murder. The grand jury also returned an indictment against Mr. Hernandez.

### A Witness Recants, A New Witness Appears

75.     On November 3, 2009, after appearing before the grand jury, Giselle Albelo recanted her witness statement and identification of Charles Wilhite in a sworn affidavit. In the affidavit, she described being "in fear and [feeling] extreme pressure from police to provide certain details" at the time she signed her witness statement. Ms. Albelo admitted that her witness statement was not true, that she had been home at the time of the shooting, and that she had not witnessed the crime.

76.     On March 10, 2010, Defendant Pioggia and another Springfield police officer went to the Hampden County Jail in Ludlow to interview Nathan Perez. Mr. Perez had been living in Springfield near the Pine Street Market when Alberto Rodriguez was killed. Anthony Martinez had identified Mr. Perez as one of the people who had picked up shell casings after the shooting.

77.     On information and belief, Defendant Pioggia visited Mr. Perez to obtain new witness testimony that would implicate Charles Wilhite as the shooter and undercut Giselle Albelo's recantation.

78.     During the interview, Mr. Perez told Defendant Pioggia that he had been near the Pine Street Market at the time of the shooting and had picked up shell casings off the ground just after the shooting. He told Defendant Pioggia that he could not identify the shooter.

79.     Defendant Pioggia told Mr. Perez that he would be charged with being an accessory after the fact to murder if Mr. Perez could not identify the shooter. Defendant Pioggia also told Mr. Perez that his pending criminal charges would be dropped if he cooperated with police. The interview ended after Mr. Perez repeated that he could not identify the shooter.

80.     On April 7, 2010, Defendant Pioggia returned to the Ludlow jail to interview Mr. Perez again. During the interview, Defendant Pioggia showed Mr. Perez a single photograph of Charles Wilhite. Defendant Pioggia told Mr. Perez, "You know him." Mr. Perez responded, "No I don't." Defendant Pioggia told Mr. Perez that if he did not identify Mr. Wilhite as the shooter, Mr. Perez would be charged with accessory after the fact to murder.

81.     Mr. Perez agreed to identify Mr. Wilhite as the shooter in exchange for immunity from an accessory charge and for favorable treatment on his pending criminal charges.

82.     Mr. Wilhite's trial began on November 16, 2010. He was tried together with Angel Hernandez. The only evidence presented against Mr. Wilhite was the testimony of the alleged eyewitnesses from whom Defendants Pioggia and Tatro had obtained witness statements. The trial ended on December 7, 2010, when the jury convicted Mr. Wilhite and Mr. Hernandez of murder in the first degree. Mr. Wilhite was sentenced to life in prison without the possibility of parole.

### Nathan Perez Recants

83.     On August 17, 2011, Nathan Perez signed a sworn affidavit recanting his statement to police, his trial testimony, and his identification of Charles Wilhite. Mr. Perez also signed a

separate sworn statement detailing how Defendant Pioggia threatened and coerced him to falsely identify Mr. Wilhite as the shooter.

84.     Mr. Perez's sworn statement says, "[T]he two Detectives showed me the photo of Charles Wilhite . . . as a single photo – and not with other photos." Mr. Perez also stated that "[t]he Detective (Pioggi) [*sic*] wrote 'shooter' under the photo and told me to initial it. This is sort of how the interview went where they were giving information to agree to."

85.     Based on Mr. Perez's recantation, and the fact that Giselle Albelo had previously described police intimidation in her affidavit when she recanted, Mr. Wilhite obtained leave of court to supplement his motion for a new trial, which initially had been filed shortly after the jury returned its verdict.

86.     On April 9–10, 2012, the trial judge, Justice Peter A. Velis, held an evidentiary hearing regarding Mr. Perez's recantation. At the hearing, Defendant Pioggia testified untruthfully, denying that he had engaged in the misconduct described above.

87.     On May 14, 2012, Justice Velis allowed Mr. Wilhite's motion and granted him a new trial.

88.     In his ruling, Justice Velis made specific factual findings that Mr. Perez felt pressured to implicate Charles Wilhite. Justice Velis explicitly did not credit Defendant Pioggia's testimony at the hearing about what had happened during his interviews with Mr. Perez. The Court wrote that the version of events Defendant Pioggia had testified to was "implausible" and "strain[ed] credulity."

### *The Jury Acquits Mr. Wilhite*

89.     Mr. Wilhite's retrial began on January 7, 2013. As with the first trial, the only

evidence against Mr. Wilhite came from the alleged eyewitnesses that Defendants Pioggia and Tatro

had questioned. On January 17, the jury found him not guilty and he was released from custody.

90.     Mr. Wilhite spent 40 months in prison for a crime he did not commit.

91.     While he was in prison, Mr. Wilhite suffered physical injuries when he was punched

by another prisoner.

92.     Mr. Wilhite suffered significant emotional injuries as a result of his arrest,

prosecution, and wrongful conviction. He knew that he might spend the rest of his life in prison for

a crime he did not commit. He feared that he might be forced to defend himself while wrongfully

imprisoned, which would result in new criminal charges against him. He feared that, even if the

murder conviction was eventually vacated, he would still face a long prison sentence for incidents

that happened while wrongfully incarcerated.

93.     Mr. Wilhite was depressed while in prison. He felt the emotional weight of facing a

mandatory life sentence for a crime he did not commit. He hoped that the truth would eventually

come out, but he knew that the chances of being released after a jury convicted him were slim. He

often thought about his daughters, who were two and four years old when Mr. Wilhite was arrested.

He thought about how he would not be able to be there for them as they grew up. He missed being

with them. Visits with his two-year-old daughter were particularly hard. Mr. Wilhite felt so depressed

after visits with her that he eventually asked his family to stop bringing her on visits. He loved seeing

her, but felt devastated after each visit knowing that he might never be able to see her grow up.

94.     Mr. Wilhite's emotional injuries as a result of his wrongful conviction and

imprisonment are ongoing. He no longer feels he can trust anyone. He did not know the people

who accused him of committing a murder. Now he fears that other people he encounters may accuse him of doing something else. He worries that anyone he comes across doing daily tasks will accuse him of committing a crime. He is suspicious of nearly everyone he encounters.

95.     Mr. Wilhite suffered lost wages while in custody and a loss of earning capacity since his release. He had been employed as a home health aide for several years at the time of his arrest but has not been able to return to that job since his release because of the emotional injuries described above.

## CLAIMS

**COUNT I     42 U.S.C. § 1983 Claim Against Defendants Pioggia and Tatro**

96.     The above paragraphs are incorporated by reference.

97.     Defendants Pioggia and Tatro used irreparably suggestive techniques to get witnesses to identify Charles Wilhite. Any reasonable police officer would have known that the techniques Defendants Pioggia and Tatro used in this investigation are improper, unreliable, and likely to lead to false eyewitness identifications.

98.     Defendants Pioggia and Tatro drafted knowingly false and misleading witness statements and investigative reports to conceal their improper investigative tactics.

99.     Defendants Pioggia and Tatro ignored obvious inconsistencies in witness statements that would have alerted any reasonable police officer to the fact that the alleged eyewitnesses were not providing reliable evidence.

100.     Defendants Pioggia and Tatro disregarded basic procedures for conducting photo identifications that are designed to prevent false eyewitness identifications. They fabricated incriminating evidence against Mr. Wilhite by threatening and intimidating witnesses to identify his picture in photo arrays.

101.     Defendants Pioggia and Tatro arrested Mr. Wilhite without probable cause based on evidence they knew or should have known was false.

102.     Defendants Pioggia and Tatro maliciously prosecuted Mr. Wilhite, depriving him of his well-established constitutional right to be free from arrest without probable cause and to be free from an unreasonable seizure of his person under the Fourth Amendment to the United States Constitution as applied under the Fourteenth Amendment and his right to due process of law under the Fourteenth Amendment.

103.     As a direct and proximate result of Defendants' actions, Mr. Wilhite suffered the damages described above.

**COUNT II     42 U.S.C. § 1983 Claim Against The City of Springfield**

104.     The above paragraphs are incorporated by reference.

105.     The City of Springfield allowed an unwritten policy or custom to develop in the Springfield Police Department of permitting police officers to threaten, coerce, and intimidate witnesses in order to obtain witness statements and identifications of criminal suspects.

106.     The Springfield Police Department has a policy or custom of failing to investigate allegations of misconduct by its police officers who violate the rights of people in Springfield and of failing to discipline officers for these violations. This includes failing to investigate allegations that police officers used excessive force and that police officers threatened or intimidated witnesses into providing false information about a case in order to help police officers obtain convictions. This policy or custom has led Springfield police officers to believe that they can violate the Constitution with impunity because they will not be investigated or disciplined for their misconduct.

107.     The Springfield Police Department allows its police officers, particularly its detectives working in the homicide unit, to perform their work with a view that the ends justify the

means. This way of thinking became a custom in the police department so that police officers felt that obtaining convictions through methods that violate the laws of the Commonwealth and the United States Constitution was an acceptable way of performing their work. As a result, Springfield police officers felt that manufacturing evidence such as knowingly false witness testimony and identifications would be accepted by the Springfield Police Department even though it violated the laws of the Commonwealth and the United States.

108.    For nearly a decade before Defendants' misconduct in this case, law enforcement officials around the country, including the Attorney General of the United States, had been emphasizing the need for police departments to implement policies controlling eyewitness identification procedures. These include double-blind eyewitness identification procedures and policies requiring thorough and accurate record keeping. The purpose of these policies is to prevent erroneous eyewitness identifications, corrupt police practices during an identification, and wrongful convictions that may result from these errors or misconduct.

109.    The Springfield Police Department did not maintain a written policy on eyewitness identification procedures, nor did the department properly supervise and train its police officers on eyewitness identification procedures.

110.    The Springfield Police Department developed a widespread custom of police officers using improper and unduly suggestive identification procedures. Springfield police officers used these procedures to influence the content of witness testimony and to obtain identifications of the people the police suspected.

111.    These policies and customs of the City of Springfield were the moving force behind Defendants Pioggia's and Tatro's violations of Mr. Wilhite's constitutional rights to be free from arrest without probable cause and to be free from an unreasonable seizure of his person under the

Fourth Amendment to the United States Constitution as applied under the Fourteenth Amendment and his right to due process of law under the Fourteenth Amendment.

112.    As a direct and proximate result of Defendants' actions, Mr. Wilhite suffered the damages described above.

**COUNT III   Tort of Malicious Prosecution Against Defendants Pioggia and Tatro**

113.    The above paragraphs are incorporated by reference.

114.    Defendants Pioggia and Tatro caused criminal proceedings to be instituted against Mr. Wilhite without probable cause and with malice as defined by state tort law. The proceedings terminated in Mr. Wilhite's favor.

115.    As a direct and proximate result of Defendants' actions, Mr. Wilhite suffered the damages described above.

**COUNT IV   Tort of Intentional Infliction of Emotional Distress Against Defendants Pioggia and Tatro**

116.    The above paragraphs are incorporated by reference.

117.    Defendants Pioggia and Tatro acted intentionally to arrest, imprison, and bring criminal charges against Mr. Wilhite without probable cause.

118.    Defendants Pioggia and Tatro's conduct was extreme and outrageous and likely to result in emotional distress to Mr. Wilhite.

119.    Defendants Pioggia and Tatro caused Mr. Wilhite to suffer severe emotional distress.

120.    As a direct and proximate result of Defendants' actions, Mr. Wilhite suffered the damages described above.

**WHEREFORE,** Plaintiff requests that this Court:

1.      Award compensatory damages;

2.      Award punitive damages against Defendants Pioggia and Tatro;

3.      Award the costs of this action, including reasonable attorneys' fees; and,

4.      Award such other further relief as this Court may deem necessary and appropriate.

## JURY DEMAND

A trial by jury is hereby demanded.

RESPECTFULLY SUBMITTED,

For the Plaintiff,
By his attorneys,

/s/ Howard Friedman
Howard Friedman, BBO #180080
David Milton, BBO #668908
Drew Glassroth, BBO #681725
**Law Offices of Howard Friedman, PC**
90 Canal Street, Fifth Floor
Boston, MA 02114-2022
(617) 742-4100
hfriedman@civil-rights-law.com
dmilton@civil-rights-law.com
dglassroth@civil-rights-law.com

Date: January 29, 2014

**CERTIFICATE OF SERVICE**

I certify that on this day I caused a true copy of the above document to be served upon the attorney of record for all parties via CM/ECF.

Date:      January 29, 2014    /s/ Howard Friedman
                               Howard Friedman